THOMAS F. SCHMIDT and LORINNA JHINCIL SCHMIDT, Plaintiffs–Appellants, v. THE BOARD OF DIRECTORS OF THE ASSOCIATION OF APARTMENT OWNERS OF THE MARCO POLO APARTMENTS and MARCO POLO MANAGEMENT, Defendants–Appellees

NO. 15672

(CIV. NO. 87–1835)

SEPTEMBER 15, 1992

LUM, C.J., WAKATSUKI, AND LEVINSON, JJ., AND INTERMEDIATE COURT OF APPEALS ASSOCIATE JUDGE WATANABE, IN PLACE OF MOON, J., RECUSED, AND INTERMEDIATE COURT OF APPEALS ASSOCIATE JUDGE HEEN, IN PLACE OF KLEIN, J., RECUSED

## OPINION OF THE COURT BY LEVINSON, J.

The plaintiffs–appellants Thomas F. Schmidt and Lorinna Jhincil Schmidt (collectively the Schmidts) appeal the trial court's denial of their motion for attorneys' fees, costs, and prejudgment interest. We agree with the trial court that Hawaii Revised Statutes

(HRS) § 514A–94(b) (Supp. 1991) does not apply to the Schmidts' action against the defendants–appellees The Board of Directors of the Association of Apartment Owners of the Marco Polo Apartments and Marco Polo Management (collectively the Association). We also conclude that the trial court did not abuse its discretion in denying an award of prejudgment interest. We thus affirm the trial court's order.

## I.

On July 4, 1987, the Schmidts filed a verified complaint against the Association, alleging that the Association was *"negligently or through other breach of duty* legally responsible in some fashion for the events and happenings herein referred to, and [that the Association] proximately caused injury and damages thereby to the Plaintiffs." (Emphasis added.) The complaint specifically claimed that "[c]ommencing in 1978, and continuing continuously to date," the Schmidts had complained to the Association of "water leakage" into their penthouse unit from the roof of the Marco Polo Apartments (the Marco Polo) and that the Association had failed to "correct said water leakage." According to the complaint, the Association was responsible for the water leakage because the roof of the Marco Polo was "under the sole control and authority of" the Association, the roof being a "common area" of the Marco Polo; the complaint further urged that, pursuant to the declaration and by–laws of the Association, the Association had "a duty and obligation to maintain, replace and/or restore the common areas, such as the roof."[1]

---

[1] The pertinent provision of the Association's declaration provided:

    II. ADMINISTRATION OF THE PROJECT. Operation of the Project and maintenance, repair, replacement and restoration of the common elements, and any additions and alterations thereto, shall be in accordance with the provisions of said Horizontal Property Act [Chapter

Based on the damage allegedly caused to the Schmidts' penthouse unit, including damage to the walls, ceiling, furniture, fixtures, and personal property, the Schmidts' complaint claimed $60,000 in property damage, at least $290,000 in lost rent, at least $750,000 for damage to reputation and business, at least $2,000,000 for emotional distress, $2,000,000 in punitive damages, and treble damages pursuant to HRS § 480–2 (1985). The complaint, however, did not pray for any equitable, mandatory, or injunctive relief to force the Association to correct the alleged water leakage.

At trial, the jury rendered a special verdict in favor of the Schmidts, finding the Association seventy percent and the Schmidts thirty percent legally responsible for the Schmidts' damages. In accordance with the jury's special verdict, the trial court awarded the Schmidts damages of $127,516.41, but denied their motion for attorneys' fees and costs pursuant to HRS § 514A–94(b), ruling that the statute "[did] not apply to this action . . . ." The trial court also denied the Schmidts' request for prejudgment interest.

---

514A], this Declaration and the By–Laws of the Association, and specifically without limitation the Association shall:

\* \* \*

3. Well and substantially repair, maintain, amend and keep all common elements of the Project, . . . with all necessary reparations and amendments whatsoever in good order and condition except as otherwise provided herein . . . .

The pertinent provisions of the Association's by–laws provided:

ARTICLE IV
ADMINISTRATION

Section 1. Management. The Board of Directors shall at all times manage and operate the Project and shall have such powers and duties as may be necessary or proper therefor including without limitation the following:

\* \* \*

(b) Provide maintenance, repair, replacement and restoration of the common elements and any additions and alterations thereto . . . .

The Schmidts timely appealed from the order denying attorneys' fees, costs, and prejudgment interest.

## II.

## A.

The Schmidts contend that the trial court erred in ruling that HRS § 514A–94(b) did not apply to their action because "th[e] action involved a claim by a condominium owner which was substantiated against the . . . [Association] to enforce a provision of the Declaration or By-Laws." The Association argues that the trial court was correct in its ruling because the Schmidts were not seeking to enforce any provision of the Association's declaration, by-laws, house rules, or HRS Chapter 514A, but rather were pursuing a simple tort action to recover damages resulting from the Association's negligent failure to maintain the Marco Polo's roof.[2]

The question of the types of actions to which HRS § 514A–94 applies is one of first impression in the Hawaii appellate courts.[3]

---

[2] The case had originally been assigned to the Court Annexed Arbitration Program (the CAAP), which "is a mandatory, non–binding arbitration program . . . for certain civil cases[,]" Hawaii Rules of Arbitration [HRA] Rule 1, including all tort cases "having a probable jury award value, not reduced by the issue of liability and not in excess of . . . $150,000.00 . . . , exclusive of interest and costs[.]" HRA Rule 6(A). By Order Removing Case from the Court Annexed Arbitration Program, the arbitration judge removed the case from arbitration because "the Court determined that the purpose and intent of the Arbitration Program would not be met by keeping the case in the Program." The purpose of the CAAP "is to provide a simplified procedure for obtaining a prompt and equitable resolution of certain civil matters . . . [,]" HRA Rule 2(A), and "[a]rbitration hearings are intended to be informal, expeditious and consistent with the purposes and intent of these rules." HRA Rule 2(C). Thus, by implication, the case was removed from the Program because it could not be promptly, equitably, and expeditiously resolved through arbitration.

[3] The Association argues that there is a Hawaii Supreme Court case that has addressed the statutory interpretation of HRS § 514A–94, but it is mistaken. While there is a Hawaii case that discusses HRS § 514A–94, it is an Intermediate

HRS § 514A–94(b) provides in pertinent part that "all reasonable and necessary expenses, costs, and attorneys' fees . . shall be awarded" to an owner who substantiates any claim "in any action against an association, any of its officers or directors, or its board of directors *to enforce* any provision of the declaration, bylaws, house rules, or this chapter . . . ." (Emphasis added.) The parties disagree as to the meaning of the term "enforce."

.This court has often stated that "[t]he fundamental starting point for statutory interpretation is the language of the statute itself. . . . [W]here the statutory language is plain and unambigu-

---

Court of Appeals (ICA) opinion, and the ICA expressly stated therein that it was not "passing either upon the applicability of [HRS] § 514A–94 . . . to the situation or the amount of attorney's fees awarded." *D'Elia v. Association of Apartment Owners of Fairway Manor*, 2 Haw. App. 350, 351, 632 P.2d 298, 299 (1981). In *D'Elia*, the circuit court granted partial summary judgment in favor of the Association on Counts I and II of the D'Elias' three–count complaint, and on Rule 54(b) certification the D'Elias had filed an appeal. *Id.* at 350, 632 P.2d at 299. The Association then moved for and was granted an award of attorney's fees pursuant to HRS § 514A–94 based on a dispute arising out of enforcement of a purported amendment to the Association's by–laws. *Id.* On appeal, the ICA reversed the award of attorney's fees because the amendment to the by–laws attached to the Association's motion for summary judgment was an uncertified, unsworn document and had therefore improperly been considered by the circuit court. *Id.* Moreover, the ICA ruled that the circuit court had lacked jurisdiction to rule on the Association's motion for attorney's fees because the Association's motion had been filed after the D'Elias' had appealed Counts I and II; accordingly, the circuit court only retained jurisdiction over Count III. *Id.* at 351, 632 P.2d at 299. In dictum, the ICA stated:

> However, we have a different reason for reversing the award of attorney's fees. Clearly, as a matter of law, no attorney's fees could be awarded upon Count III of the complaint which was all that was left after the Rule 54(b) order with respect to Counts I and II was entered. Count III was a simple count for damages to appellants' [D'Elias'] property by reason of activities of the appellee [Association] thereon. Since there is no agreement, statute, rule or precedent upon which attorney's fees with respect to such count can be awarded, it follows that the attorney's fees granted by the court below were necessarily limited to services rendered with respect to Counts I and II.

*Id.* at 350–51, 632 P.2d at 299.

ous, our sole duty is to give effect to its plain and obvious meaning." *See, e.g., In re Tax Appeal of Lower Mapunapuna Tenants Ass'n*, 73 Haw. 63, 68, 828 P.2d 263, 266 (1992) (quoting *National Union Fire Ins. Co. v. Ferreira*, 71 Haw. 341, 345, 790 P.2d 910, 913 (1990). Where, as in the present case, the operative language (i.e., "enforce") is undefined in a statute, we presume that the words in question "were used to express their meaning in common language." *Id.* at 66, 828 P.2d at 265; *see also* HRS § 1–14 (1985). Black's Law Dictionary (6th ed. 1990) defines "enforce," *inter alia*, to mean "[t]o put into execution, to cause to take effect; . . . to compel obedience to." *Id.* at 528. Webster's Encyclopedic Unabridged Dictionary of the English Language (1989) defines "enforce," *inter alia*, to mean "to . . . compel obedience to; . . . to impose (a course of action) upon a person . . . ." *Id.* at 473.

Thus, the "plain and obvious" application of HRS § 514A–94(b) is to an owner's substantiated claim against an association or its board to impose an *affirmative* course of action upon the association to put into execution — or to compel obedience to — any provision of its declaration, by–laws, house rules, or any enumerated provision of HRS chapter 514A.

"[D]eparture from the plain and unambiguous language of the statute cannot be justified without a clear showing that the legislature intended some other meaning would be given the language[,]" *In re Tax Appeal of Lower Mapunapuna Tenants Ass'n*, 73 Haw. at 68, 828 P.2d at 266 (quoting *Espaniola v. Cawdrey Mars Joint Venture*, 68 Haw. 171, 179, 707 P.2d 365, 370 (1985)), or that a "literal interpretation would produce absurd or unjust results that are clearly inconsistent with the purposes and policies of the statute." *Kang v. State Farm Mut. Auto. Ins. Co.*, 72 Haw. 251, 254, 815 P.2d 1020, 1021–22 (1991) (citations omitted). The legislative history of HRS § 514A–94 reveals no intent that "enforce" was to be given anything other than its "plain and

obvious" meaning.[4]  Moreover, we conclude that resort to the "plain and obvious" meaning of "enforce" would not produce "absurd or unjust results" in the application of HRS § 514A–94(b).

In this case, the Schmidts did not seek to enforce any *affirmative* action on the part of the Association to comply with any provision of the Association's declaration, by–laws, house rules, or HRS chapter 514A; rather, in their own words, they were "seeking damages . . . [for the Association's] fail[ure] to comply with the By–Laws and Declaration." As in any common, "garden variety" tort action, the Schmidts were seeking damages from the Association for the breach of a duty owed to them, i.e., the Association's *failure* to enforce its declaration and by–laws. In the absence of any prayer for equitable, mandatory, or injunctive relief to compel obedience to the Association's declaration, by–laws, house rules, or any enumerated provision of HRS chapter 514A, HRS § 514A–94(b) does not apply to the Schmidts' action.

Therefore, we hold that the trial court did not err in denying the Schmidts' motion for attorneys' fees and costs pursuant to HRS § 514A–94(b).

## B.

Prejudgment interest, where appropriate, is awardable under HRS § 636–16 in the discretion of the court. *Leibert v. Finance Factors, Ltd.*, 71 Haw. 285, 293, 788 P.2d 833, 838 (1990). Generally, to constitute an abuse of discretion it must appear that the court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant. *State v. Akina*, 73 Haw. 75, 78, 828 P.2d 269, 271 (1992); *Sapp v. Wong*, 62 Haw. 34, 41, 609 P.2d 137, 142 (1980).

HRS § 636–16 (1985) provides:

---

[4] The legislative history of HRS § 514A–94(b) sheds no light on what the legislature intended the term "enforce" to mean.

> In awarding interest in civil cases, the judge is
> authorized to designate the commencement date to con-
> form with the circumstances of each case, provided that
> the earliest commencement date in cases arising in tort,
> may be the date when the injury first occurred and in
> cases arising by breach of contract, it may be the date
> when the breach first occurred.

This court has recognized that the "purpose of the statute . . . [is] to allow the court to designate the commencement date of interest in order to correct injustice when a judgment is delayed for a long period of time for any reason, including litigation delays." *Leibert*, 71 Haw. at 293, 788 P.2d at 838; *see also Wiegand v. Colbert*, 68 Haw. 472, 478, 718 P.2d 1080, 1084 (1986) ("[T]he legislative history shows [that] the purposes of the statute [HRS § 636–16] were to permit more equitable results and to more speedily resolve cases.").[5]

Any delays in the present case in the rendering of a final judgment were due to actions on the part of the Schmidts and not the Association.[6] Therefore, the trial court did not abuse its discretion

---

[5] The legislative history of HRS § 636–16 states:

> The purpose of this bill is to more clearly define the trial judge's discretion in awarding interest in civil cases.

> Your committee understands that at the present time interest is generally awarded commencing on the day the judgment is rendered. Where the issuance of a judgment is greatly delayed for any reason, such fixed commencement date can result in substantial injustice. Allowing the trial judge to designate the commencement date will permit more equitable results. Also, it is expected that party litigants will give serious regard to this discretion on the part of the trial judge so that those who may have had an unfair leverage by the arbitrariness of the prior rule will arrive at the realization that recalcitrance or unwarranted delays in cases which should be more speedily resolved will not enhance their position or assure them of a favorable reward.

Sen. Conf. Comm. Rep. No. 67, in 1979 Senate Journal, at 984.

[6] By "Notice of Proposed Dismissal," the circuit court informed the Schmidts that because "no pretrial statement ha[d] been filed within one year after the com-

in denying the Schmidts' request for prejudgment interest. *See* ***Locricchio v. Legal Services Corp.***, 833 F.2d 1352, 1360 (9th Cir. 1987) (under Hawaii law, no abuse of discretion when trial court denied prejudgment interest to party whose dilatoriness accounted for much of the delay in rendering of judgment). *Cf.* ***SGM Partners v. The Profit Co.***, 8 Haw. App. 86, 121, 793 P.2d 1189, 1211, *rev'd in part on other grounds*, 71 Haw. 506, 795 P.2d 853 (1990) (no abuse of discretion in award of prejudgment interest against the party that contributed to the delay in litigation proceedings).

## III.

Accordingly, we affirm the trial court's order denying the Schmidts' motion for attorneys' fees, costs, and prejudgment interest.

*John Rapp* on the brief for plaintiffs–appellants.

*Melvyn M. Miyagi* and *Dan A. Colon* (Reid, Richards & Miyagi) on the brief for defendants–appellees.

---

plaint ha[d] been filed or within any further period of extension granted by the Court," the court would dismiss the Schmidts' action with prejudice "unless objections showing good cause . . . [were] filed within ten days after receipt of this notice, or any extension thereof granted by the Court." Due to the withdrawal of counsel, the Schmidts had three different attorneys representing them at different times during the litigation of their complaint. The record reflects that the second attorney who withdrew, Stuart Cowen, had numerous problems with the Schmidts due to their "uncooperativeness" in litigating their case.